

U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

**ENTERED**

TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

Signed August 16, 2006            **United States Bankruptcy Judge**

---

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| KINGWAY LOGISTICS, INC., | § | |
|     Debtor. | § | CASE NO. 04-44028-DML-7 |
| | § | |

| | | |
|---|---|---|
| LDS EXPRESS, INC., | § | |
|     Plaintiff, | § | |
| | § | ADVERSARY NO. 05-4243 |
| vs. | § | |
| | § | |
| SHAWN BROWN, CHAPTER 7 | § | |
| TRUSTEE, | § | |
|     Defendant. | § | |

## MEMORANDUM OPINION

Before the court is Plaintiff's Motion for Summary Judgment (the "Motion") filed by

LDS Express, Inc. ("LDS," sometimes also referred to herein as Plaintiff) by which Plaintiff

seeks judgment respecting (1) its Original Complaint filed against Shawn Brown (the "Trustee"

or Defendant) in his capacity as chapter 7 trustee for Kingway Logistics, Inc. ("Logistics" or

"Debtor"); and (2) LDS's motion for relief from stay (the "Stay Motion") filed by LDS on

September 8, 2004.  By agreement of the parties, the Stay Motion was consolidated with this adversary proceeding by order dated December 28, 2005.

Plaintiff has sought leave to amend its complaint to allege that Kingway International, Inc. ("International"), rather than Logistics, is the lessor under the Lease (as defined below).  Although the court, at a hearing held June 29, 2006, deferred granting such leave until after hearing on the Motion, the court's decision respecting the Motion would not be different if Plaintiff's complaint had been so amended.

Both Plaintiff and Defendant[1] filed briefs in support of their respective positions.  The parties, at a hearing held on July 18, 2006, argued to the court.  The parties also submitted summary judgment evidence to the court, which is identified as necessary below.

This matter is subject to the court's core jurisdiction.  *See* 28 U.S.C. §§ 1334(a) and 157(b)(2)(A), (G), (K), (M) and (O).  This memorandum opinion constitutes the court's findings of fact (in the context of summary judgment) and conclusions of law.

## I.  Background

Debtor commenced this case by filing a voluntary petition under chapter 7 of the Bankruptcy Code (the "Code")[2] on April 20, 2004.  Defendant was appointed Debtor's trustee shortly thereafter.

The sole significant asset in Debtor's estate is a land tract of approximately 6.14 acres

---

[1]    Defendant filed his response to the Motion and Plaintiff's initial brief out of time.  At the July 18 hearing, the court ruled that that response and Plaintiff's reply to it would be considered.

[2]    11 U.S.C. §§ 101, *et seq.*  The Code was amended in April 2005; the amendments are mostly effective as of October 17, 2005 for cases filed on or after that date.  None of the changes to the Code that are effective for Debtor's chapter 7 case are pertinent to the matters before the court.

located in Sedgwick, Kansas, and a steel building located thereon (the "Property").  LDS is presently in possession of the Property and there operates a truck-washing facility.  Because the truck-washing facility is approved for use by trucks that transport kosher food, it has unusual (if not unique) value for, *inter alia,* LDS.  In the course of its operations at the Property, LDS has installed certain equipment (the "Equipment") for use in truck-washing.

LDS claims its right to possession of the Property pursuant to a lease dated August 24, 1999 (the "Lease").  Although Logistics is now, and at the time of execution of the Lease was, the owner of the Property, the Lease is between LDS as tenant and International as landlord. Although Logistics and International have a common owner (Dana King), LDS takes the position that, for the purposes of the Lease, at least, they should be treated as strangers to each other.

The term of the Lease is five years (Lease ¶ 2).  The Lease gives LDS the option to extend its effectiveness for two additional five-year terms (Lease ¶ 3(a)), and LDS claims it has exercised the option and extended the Lease for an additional five years.

Logistics acquired the Property from Harley and Margaret Schmidt (the "Schmidts") in 1997.  In connection with the purchase of the Property, Logistics executed a note to the Schmidts in the amount of $180,000 (the "Note").  The Note was secured by a mortgage of the Property (the "Mortgage").  The Note provided for periodic payments by Logistics to the Schmidts until November 1, 2002, at which time the balance of $122,620.60 would be due.

The latter balloon payment was not made by Logistics, and, on March 23, 2003, LDS purchased the Note and Mortgage from the Schmidts.  Thereafter, LDS sued Logistics on the

Note and Mortgage in Kansas District Court (the "Kansas Court")[3] and, on February 24, 2004, the Kansas Court entered judgment in LDS's favor (the "Judgment"). The Judgment includes awards for (1) $122,620.60 plus interest at 10% per annum from November 1, 2002, until paid; (2) $250 for title insurance; (3) attorney fees of $3,000; and (4) court costs of $134.30. The Judgment also provides that the Mortgage "be and the same is hereby decreed foreclosed . . ."

Prior to the entry of the Judgment, LDS paid monthly rentals to, or at the direction of,[4] International.[5] Since commencement of its suit to foreclose the Mortgage, LDS has not paid rent for the Property, but rather has offset the rent specified in the Lease against amounts it asserts are due to it under the Judgment.[6]

---

[3]     The Note, Mortgage, Lease and the rights of the parties respecting the Property are all to be construed under Kansas law.

[4]     In September 2001, on stationery of International in a letter executed by Logistics, LDS was directed to pay $2,000 per month of the rent to the Schmidts (the payment due under the Note) and the balance of the monthly rent "directly to Kingway." Letter of September 14, 2001.

[5]     LDS made its checks out to International when paying rent for the Property. Evan Miller Affidavit ¶¶ 7 and 16.

[6]     Actually, LDS does not necessarily agree that unpaid rent should be deducted from the debt owed by reason of the Judgment. Rather, as discussed below, LDS appears to hold the novel view that it need not pay rent for the Property at all.

## II.  Issues

Plaintiff asserts that the Motion presents the following issues (Plaintiff's brief, p.4):

1.      What amount is owed to LDS pursuant to the Judgment?

2.      What is the fair market value of the Property?

3.      Did LDS effectively exercise its option to extend the term of the Lease?

4.      Does LDS own and can it remove the Equipment on the Property?

5.      Can the Trustee reject the Lease?

6.      Should the Stay Motion be granted?

LDS, however, has raised an additional question that will necessarily affect the answers to some of the six issues listed above.  LDS contends that, because the Lease names International, not Logistics, as landlord, the Lease is not property of Debtor's estate and cannot be enforced by the Trustee.  Although this question need not be (and will not be) disposed of to decide the Motion, because those issues numbered 1, 3, 4 and 5 (at least) require different answers depending on whether the Lease is a contract between Debtor and LDS, the court will also address this subject.

## III.  Summary Judgment Standard

Summary judgment is appropriate only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," when viewed in the light most favorable to the nonmoving party, "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986) (internal quotations omitted).  A dispute about a

material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Id*. at 248. In making its determination, the court must draw all justifiable inferences in favor of the nonmoving party. *Id*. at 255.

Once the moving party has initially shown "that there is an absence of evidence to support the nonmoving party's case," *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986), the nonmovant must come forward, after adequate time for discovery, with significant probative evidence showing a triable issue of fact. FED. R. CIV. P. 56(e); *State Farm Life Ins. Co. v. Gutterman*, 896 F.2d 116, 118 (5th Cir. 1990). Conclusory allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation are not adequate substitutes for specific facts showing that there is a genuine issue for trial. *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428 (5th Cir. 1996) (en banc); *SEC v. Recile*, 10 F.3d 1093, 1097 (5th Cir. 1993). To defeat a properly supported motion for summary judgment, the nonmovant must present more than a mere scintilla of evidence. *See Anderson*, 477 U.S. at 251. Rather, the nonmovant must present sufficient evidence upon which a jury could reasonably find in the nonmovant's favor. *Id*.

The court notes that the Trustee seeks no relief at this time. Accordingly, while the court must determine each of the posed issues to the extent of whether or not to grant summary judgment in Plaintiff's favor, it is not called upon at this time to rule on any issue that the Trustee prevails. A determination that the Trustee wins on any issue must await trial.

## IV. Discussion

A.  Does the Lease Constitute a Binding Agreement Enforceable by the Trustee against LDS?

The court is mystified why Plaintiff would insist that the Lease is not property of the Debtor's estate and so should be determined not to obligate it to the Trustee (standing in the shoes of Logistics)[7] given that there is no dispute that Logistics is the owner of the Property. While a determination that the Lease is between LDS and International may relieve LDS of the requirement to pay rent as specified in the Lease to Logistics and, hence, to the Trustee, such a determination will also relieve the Trustee of any obligation to LDS as tenant of the Property. This would not only obviate the question of whether the Lease is subject to rejection under Code § 365(a), but it would also make ineffective and unenforceable vis-à-vis the Trustee any provision of the Lease, including LDS's option to renew pursuant to paragraph 3(a).

Apparently LDS is of the view that the Lease validly placed it in possession of the Property and that it has all the tenant's rights respecting the Property that are provided in the Lease. Moreover, because International has forfeited its corporate charter, LDS seems to think there is no party that can assert obligations owed by it pursuant to the Lease or with respect to the Property.

This is, of course, utter nonsense. If the Lease does not obligate LDS to Logistics (and now the Trustee), neither does the Lease evidence any obligation of the Trustee to LDS. *See*

---

[7]     If the Lease is not property of Debtor's estate, then the lease is enforceable neither by nor against (at least by LDS) the Trustee. The principal effect, therefore, of excluding the Lease from the estate is to make it wholly ineffective.

*Waechter v. Amoco Prod. Co.*, 217 Kan. 489, 531, 537 P.2d 228 (1975) (Schroeder, J.,

dissenting) ("It is elemental contract law that since the lessor is not a party to the…contract

entered into between lessee and a third party, he is not bound by the terms of same….") (internal

quotations omitted). *See also EEOC v. Waffle House, Inc.*, 534 U.S. 279, 294 (2002) ("It goes

without saying that a contract cannot bind a nonparty."); *Adams v. Unione Mediterranea di

Sicurta,* 364 F.3d 646, 652 (5th Cir. 2004) ("'Under the general principles of contract law, it is

axiomatic that courts cannot bind a non-party to a contract, because that party never agreed to the

terms set forth therein.'") (quoting *EEOC v. Frank's Nursery & Crafts, Inc.*, 177 F.3d 448, 460

(6th Cir. 1999)). If the Trustee has no obligation to LDS under the Lease, the Trustee being

successor to Logistics, then LDS does not occupy the Property as lessee under the Lease. If LDS

is not the tenant under the Lease, then, under Kansas law, LDS is a trespasser, a tenant at

sufferance or a tenant at will.[8] If LDS is a trespasser — a squatter, effectively, it not only has no

right to possession of the Property (and questionable right to claim personalty located on or

attached to the Property), but it also very likely is in violation of the automatic stay by virtue of

---

[8]     Under Kansas law, "'[a] tenancy at sufferance arises where one comes into possession of land by a lawful
title otherwise than by act of law, and occupies it thereafter without any right of title at all. . .'" Fed. Land
Bank of Wichita v. Plamann, No. 63,587, 1989 Kan. App. LEXIS 831, at *7-8 (Dec. 8, 1989) (quoting
Sorensen v. Hendry, 146 Kan. 337, 340, 69 P.2d 1114 (1937)). If the Lease was effective to grant LDS
possession, the above-quoted definition of a tenancy at sufferance accurately describes LDS's present
situation vis-à-vis the Property. There is a presumption under Kansas law, however, that one occupying
real property with the assent of the owner is a tenant at will. *See* Plamann, 1989 Kan. App. LEXIS 831, at
*7. Thus, if Logistics has not expressed a desire to remove LDS from the Property, LDS may be properly
classified as a tenant at will (the court does not need to address for purposes of the Motion whether an
effort by the Trustee to reject the Lease would destroy a tenancy at will). To be a trespasser under Kansas
law, one must have entered real property without the consent of the owner. *See* Seidl v. Shoff, 170 Kan.
689, 691, 228 P.2d 705 (1951). Thus, if there never were a valid lease and Logistics did not consent to
LDS's entry upon the Property, LDS could be classified as a trespasser. For purposes of deciding the
Motion, the court need not determine whether LDS is a trespasser, tenant at sufferance or tenant at will.

exercising control over property of the estate.  *See* Code § 363(a)(3); *Knaus v. Concordia Lumber Co. (In re Knaus)*, 889 F.2d 773, 774-75 (8th Cir. 1989); *California Empl. Dev. Dep't v. Taxel (In re Del Mission),* 98 F.3d 1147, 1151 (9th Cir. 1996); *STMIMA Corp. v. Carrigg (In re Carrigg)*, 216 B.R. 303, 305 (B.A.P. 1st Cir. 1998).

Even if LDS is a tenant at will or a tenant at sufferance, its rights will surely be no greater than under the Lease.  For example, LDS relies on Lease ¶ 18 to remove any trade fixtures it has installed on the Property.  But if LDS does not possess the Property pursuant to the Lease, whatever rights it may have to remove fixtures are those existing by reason of Kansas statute or common law.[9]  Though it has not investigated the question, the court doubts seriously that Kansas law would give greater rights to a tenant at sufferance or a tenant at will (let alone a trespasser) than were negotiated by LDS in the Lease.

Notwithstanding the apparent effects of accepting LDS's position that the lease is not enforceable by (and thus against) the Trustee, the Trustee has opposed a determination by the court that the Lease is not, in fact, an agreement binding on him and LDS.  The Trustee argues that the conduct of the parties amounts to an acknowledgment by LDS that its true landlord under the Lease was Logistics.[10]  Under Kansas Law, a contract, including a lease, may be amended by the conduct of the parties.  *See Galindo v. City of Coffeyville*, 256 Kan. 455, 465-66,

---

[9]    The parties have not briefed and the court has made no effort to research what rights LDS would have as a tenant at will, tenant at sufferance or trespasser.  No doubt the parties will educate the court as necessary on these matters in the future.

[10]   The Trustee has offered several other arguments explaining why the Lease should be deemed binding on him and LDS.  Because the court need not determine the converse of the Lease's invalidity, it need not address these arguments but need only determine that, under the undisputed facts, Plaintiff is not entitled to summary judgment on the question.

885 P.2d 1246 (1994) (citing *W-V Enters. v. Federal Sav. & Loan Ins. Corp.*, 234 Kan. 354, 673 P.2d 1112 (1983)).

There is certainly sufficient evidence in the record to support a finding that Logistics was in fact the landlord of the Property and entitled to the benefits of the Lease.  First, surely by no later than when it acquired the Note and Mortgage in March of 2003, LDS was aware that Logistics (not International) owned the property; it is hardly likely that LDS would have continued to pay rent to International if it believed International was not identifiable (whether as agent, nominee or otherwise) with the true owner of the Property.  Second, the Judgment, not only entered by the Kansas Court, but executed as prepared by counsel for LDS, specifically recognizes that Logistics was both owner and lessor of the Property.  Third, various documents (e.g., the letter from Dana King dated September 14, 2001) evidence at least ambiguity as to the identity of the landlord.  Finally, LDS's assertion that it offset rent against the Note and then the Judgment (and ceased paying rent to International) is strong evidence that LDS recognized Logistics as its landlord.  In short, a reasonable jury could find that the Lease belonged to Logistics and is property of its estate.

The court, thus, is unable to grant the Motion as to whether the Lease is property of Debtor's estate and so effective as between LDS and the Trustee. This, in turn, requires that the court consider the remaining issues posed by the Motion both as if the Lease controls relations between the parties and as if the Lease did not exist.

B.  Amount Owed LDS

The amount LDS claims is owed on the Judgment may be divided into three parts: principal and interest owed under the Judgment; attorneys fees due LDS for services since entry of the Judgment; and the amount to be offset against the Judgment by reason of LDS's possession and use of the Property.  The determination of these three amounts is different depending on whether or not the Lease is effective.

      1.    Lease Effective

If the Lease is effective, then the Trustee is entitled to credit against the Judgment for $2,500 per month in rent called for by Lease ¶ 4 (paragraph 5 of the Lease requires that the tenant pay real estate taxes on the Property as well; the evidence indicates these taxes have been paid). LDS has paid no rent for the Property since June of 2003.  The Judgment (the November 1, 2002, Note balance of $122,620.60 + 10% per annum interest to entry of the Judgment (approximately $17,368) + $250 for title insurance + fees and costs of $3,134.40) bears interest at the rate of about $1,195 per month ($143,373 x 10% ÷ 12).  This amount is less than half of the monthly rent due under the Lease.  Thus, it would appear that the Judgment should have been substantially reduced through the passage of time.[11]

A significant element of the amount claimed by LDS is attorneys' fees.  It is not clear to the court that LDS is entitled at all to post-Judgment attorneys' fees.  The Note provides that its holder may "collect all reasonable costs and expenses of suit" if suit is required to collect the

---

[11]    The court does not have before it a calculation of the amount owed LDS that it considers reliable.  How much is owed depends on both the timing of credits for payment of rent and the manner of interest calculation.  LDS's calculation in its brief of $51,098.02 of interest owed pursuant to the Judgment does not appear to have taken account of monthly rental credits and may involve compounding.  Because the court concludes (below) that it cannot in any event summarily quantify the amount owed to LDS due to the need for further evidence and briefing respecting attorneys fees, it will also defer calculating the amount

Note.  The Mortgage (at ¶ 6) similarly provides for costs and expenses incurred "in any suit to foreclose [the] Mortgage."  The Judgment, however, does not specify that the judgment creditor is entitled to costs and fees going forward, and it specifically declares the Mortgage foreclosed.

Code § 506(b) governs LDS's rights to interest and attorneys' fees as a secured creditor. Code § 506(b) (as effective in this case) provides:

> (b) To the extent that an allowed secured claim is secured by property the value of which, after any recovery under subsection (c) of this section, is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement under which such claim arose.

Thus, LDS is entitled to claim attorneys' fees only as "provided for under the agreement under which [its] claim arose."  *See United States v. Ron Pair Enters*., 489 U.S. 235, 239-40 (1989); *Bridgeport Tank Trucks v. Lien Agent (In re EnRe LP)*, No. 05-41141, 2006 U.S. App. LEXIS 18671, at *4 (5th Cir. July 25, 2006).  *See generally* 4 COLLIER ON BANKRUPTCY ¶ 506.04[4] (15th ed. rev. 2005).  Even assuming that some or all of the fees LDS seeks fit within the terms of the Note and the Mortgage, it is not at all clear that LDS's right to fees is now governed by those instruments as opposed to the Judgment.  Under Kansas law, the Note and Mortgage may have been extinguished through merger into the Judgment.  *See Federal Land Bank v. Pierson*, 787 P.2d 741 (Kan. Ct. App. 1990); *Price v. First Nat'l Bank,* 62 Kan. 735, 739-741, 64 P. 637 (1901).  If such a merger has occurred, any rights LDS has must be found in the Judgment.  *See Youngman v. Fleet Bank, N.A. (In re A&P Diversified Technologies Realty,*

---

due under the Judgment by reason of interest and offsets.

*Inc.)*, No. 04-3622, 2006 U.S. App. LEXIS 1179, at *9 (3d Cir. Jan. 19, 2006) (citing *In re Roach*, 824 F.2d 1370, 1377 (3d Cir. 1987)); *In re Schlecht,* 36 B.R. 236, 240 (Bankr. D. Alaska 1983). The Judgment makes no provision for payment by Logistics of fees or costs incurred by LDS in its enforcement; therefore, if a merger of the Note and Mortgage into the Judgment has occurred, LDS is not entitled to *any* attorneys' fees incurred since entry of the Judgment.

Moreover, even if LDS is entitled to attorney's fees under Code § 506(b), the fees it is entitled to must be reasonable (Note; Mortgage ¶6; Code § 506(b)). The amount sought by LDS (more than $71,000 at the time of filing of its brief in support of the Motion) appears to the court facially suspect — it does not seem "reasonable" to spend that amount to collect a judgment of less than $145,000.[12]

Furthermore, LDS frankly acknowledges that the fees it seeks include work done pertaining to the Lease. To the extent LDS either defends its rights under the Lease or attempts to prevent the Trustee's enforcement of the Lease against it, LDS does not act in its capacity as a secured creditor. It is entitled to attorneys' fees, if at all, only for actions taken to defend or enforce its secured claim. *See In re Hudson Shipbuilders, Inc.*, 794 F.2d 1051, 1058 (5th Cir. 1986); *In re Cummins Util., L.P.*, 279 B.R. 195, 204 (Bankr. N.D. Tex. 2002); *In re Delaney Family L.P.*, No. 02-46631*,* 2003 Bankr. LEXIS 1685, at *20 (Bankr. N.D. Tex. Dec. 11, 2003).

Because LDS has not provided evidence proving that the fees it seeks are allowable under

---

[12]     Some of the fees sought by LDS pertain to the Motion. *See* Affidavit of Bruce W. Akerly, ¶12. In the court's view the Motion, though certainly well written and professionally formatted, as to much of the relief sought may not even pass the red-face test, let alone rise to the level of reasonableness. If the Motion is taken as a sample of the legal work product for which LDS seeks reimbursement, the court has no trouble concluding that a reasonable jury might find the fees sought unreasonable.

section 506(b), and because the court (or, in its stead, a reasonable jury) is unable to otherwise quantify what is owed pursuant to the Judgment, the Motion must be denied to the extent it seeks a determination of the amount owed to LDS.  The court, however, is prepared to find, for purposes of the Stay Motion's disposition pursuant to the Motion, based on the evidence before it, that the debt to LDS is no more than, and may be considerably less than, $200,000.

  2.  Lease Ineffective

  If, as LDS insists, the Lease cannot be enforced by the Trustee, the amounts due under the Judgment will be the same except that the Trustee would not be entitled to credit on the Judgment for rent as provided in the Lease.  Also, because LDS's obligation to pay real estate taxes on the Property is found in the Lease, if the Lease is ineffective, LDS would be owed by the Trustee for taxes paid (*cf.* proof of claim filed November 4, 2004, by LDS: attached calculation of claim listing "Taxes Paid on Behalf of Debtor" of $16,252.49).

  That the Lease is ineffective, however, does not mean that LDS is entitled to occupy the Property for free.  It would be contrary to common sense and inconsistent with state and federal debtor-creditor law (e.g., Code §§ 548 and 549) for the court not to consider the value to LDS of possession of the Property in determining the amount it is owed.[13]  Whether LDS is a trespasser, a tenant at will or a tenant at sufferance, under Kansas law the Trustee would be entitled to compensation for LDS's use of the Property.  *See Ultimate Chemical Co. v. Surface Transp. International, Inc*., 232 Kan. 727, syl. para. 3, 658 P.2d 1008 (1983) ("In an action for trespass, the wrongdoer should compensate for all the injury naturally and fairly resulting from his

---

[13]  So far as the record before the court shows, LDS has paid nothing to International since entry of the

wrong."); *Plamann*, 1989 Kan. App. LEXIS 831, at *8 (owner of real property entitled to compensation from tenant at sufferance for actual value of use and occupancy of the property); *Sorensen*, 146 Kan. at 341 ("So long as defendant occupied the property he was liable for the rents.").

Even if the Lease is ineffective, it provides some evidence of the value of the right to occupy the Property. Given that LDS sought (and seeks now) to renew the Lease, the court concludes that, even if LDS occupies the Property as a trespasser, a tenant at sufferance or a tenant at will, it must, on a quantum meruit basis, be assessed rent at least at the rate specified in the Lease.

C.     Fair Market Value of the Property

LDS offers a March 2006 appraisal of the Property by Roger Turner Company ("Turner") to prove the Property is worth $200,000. Turner had earlier (June 2004) appraised the Property at $230,000. The Trustee has proposed a sale of the Property (which the court has not approved) for $211,000.[14]  Dana King (Debtor's owner and principal) has estimated the fair market value of the Property to be $275,000 – $300,000. On this record, there is clearly a dispute over value; the court can do no more than find (for purposes of the Stay Motion's disposition pursuant to the Motion) that the Property's fair market value is at least $200,000.

---

Judgment, despite its insistence that it is only obligated to International under the Lease.

[14]     As value is of principal concern in respect to the Stay Motion, which is a contested matter, the court will take into account testimony offered in support of this sale. *See* Nantucket Investors II v. California Fed. Bank (*In re* Indian Palms Assocs. Ltd.), 61 F.3d 197, 203 (3d Cir. 1995); *cf. In re* Alexander, 284 B.R. 626, 629 (Bankr. N.D. Ohio 2002) (court taking into account record from entire bankruptcy case in deciding contested matter). That testimony offers some support for the conclusion that the value of the Property has been adversely affected by the dispute between LDS and the Trustee.

D.      Renewal of the Lease

Obviously whether LDS's renewal of the Lease was effective (vis-à-vis the Trustee)

depends on the whether the Trustee is bound by the Lease.  Therefore, if the Lease is not

property of Debtor's estate, as LDS contends, the question of whether LDS properly renewed it

is moot.  If, on the other hand, the Lease is in effect between LDS and the Trustee, LDS

was entitled to renew it if LDS was "not then in default under any term or condition of [the] Lease."  Lease ¶ 3(a).

LDS gave notice by Evan Miller's letter of October 1, 2003, to International, of its intent to renew the Lease for an additional five-year term.  Though that letter provides for International's acknowledgement of the renewal, no such acknowledgment was ever made.  The Trustee now argues that this fact plus LDS's failure to pay rent from June to October 2003 (and thereafter) and delay in payment of real estate taxes as required by Lease ¶5, means the renewal was ineffective.  According to the Trustee, nonpayment of rent and late payment of taxes amounted to the existence of a default by LDS under the Lease.  Since renewal was conditioned upon the Lease not being in default, the Trustee argues, renewal could not have occurred.

Paragraph 17 of the Lease deals, however, with defaults.  A default exists when LDS "fail[s] to pay Rent . . . due hereunder *within five (5) days after the receipt of written notice* that the same shall be due."  Lease ¶17(a)(a) (emphasis supplied).  It is not clear whether payment of taxes is subject to the same provision, but if it falls under the alternate provisions of paragraph 17(a)(b), even more notice — thirty days — is a prerequisite to default.

There is nothing in the record before the court to show LDS was given notice of any default at the time it sought to renew the Lease.  As to payments of rent, all the evidence before the court suggests that Logistics at the time of Evan Miller's October 1, 2003, letter and through entry of the Judgment acquiesced in LDS's crediting of rent against the Note or, later, the Judgment.  Given the Trustee's position that the Lease is currently in effect,[15] given the Trustee's

---

[15]      Having taken the position that the Lease is presently in effect, the Trustee may be estopped from

failure to produce evidence that LDS did not exercise its renewal option properly, the court must grant the Motion as to LDS's renewal of the Lease (if the Lease is in effect).

### E. Ownership of Equipment

LDS next asks that the court rule that the Equipment it purchased and installed at the Property belongs to it and may be removed by it from the Property. If the Lease does not control the rights of LDS vis-à-vis the Trustee, the owner of the Property, however, LDS's rights to the Equipment, if any, will depend on how tenants at sufferance, tenants at will or trespassers are dealt with under Kansas law. As the parties have not addressed this issue, the court will limit its discussion of the Equipment to the result required if the Lease is in effect.

Yet it is immediately clear that LDS is not entitled to summary judgment concerning ownership of the Equipment. Clearly LDS, as a legitimate tenant, may remove unattached personal property from the Property. Under Lease ¶18, LDS may remove trade fixtures it installed. The problem with the Equipment is that its purchase was necessitated by the need to "replace" or acquire "new" pieces of Equipment. Items LDS asserts it paid for also include a "wash bay floor and . . . floor drains," wall coverings and grading and resurfacing. Affidavit of Evan Miller ¶¶ 27-34.[16]

---

arguing that LDS's renewal was ineffective. *See* New Hampshire v. Maine, 532 U.S. 742, 749 (2001) ("Where a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him."); US LIFE Corp. v. U.S. Life Ins., 560 F. Supp. 1302 (N.D. Tex. 1983); Lawrence v. United States *(In re* Lawrence*),* 277 B.R. 135, 139 (Bankr. N.D. Fla. 2001); 18 MOORE'S FEDERAL PRACTICE § 134.30 (3d ed. 2006). Although under *New Hampshire v. Maine,* the Trustee will only be estopped if the court ultimately determines that the Lease is not effective, the court addresses the renewal issue at this point assuming that the Lease is, in fact, effective.

[16]     It is not clear what property LDS means by the Equipment. Mr. Miller's affidavit is not specific as to what

The affidavit, by Mr. Miller's own testimony, raises the question of whether the Equipment replaced equipment originally let with the Property and since worn out.[17]  If, for example, the Equipment replaced worn out equipment, LDS's rights may be governed by other provisions of the Lease:  ¶7, Maintenance ("Tenant shall . . . pay for and make all other necessary repairs and replacements to the Property"); ¶10, Alterations; ¶18 ("Tenant shall surrender the Property . . . in as good condition" as when it was leased).  If any of these provisions applies to the Equipment, LDS may not be entitled (or have any right) to its possession.  Thus, genuine issues of fact concerning ownership of the Equipment exist, and summary judgment is not appropriate.

F.      Rejectability of the Lease

LDS next asks the court to rule that the Code does not permit the Trustee to reject the Lease.  The court's ruling on this issue will vary depending on whether the parties' relations are governed by the Lease.

---

LDS paid for that it now wishes to remove.  In its brief (p. 17, n.10) LDS describes the Equipment as:

> The equipment that LDS claims it owns includes, but is not limited to, the CIP wash tanks, the CIP control panel, the burner on the boiler, the separating tanks, and the stainless steel platform.  Except for the building, all of the equipment LDS claims ownership to is depicted in exhibits 2-15 in Mr. Booher's deposition dated April 12, 2006.  *See* App. 286-338, 348-361; Booher Transcript p. 1-52:1-25, 53:1-13.

The list given, being non-exclusive, is not helpful to the court in the context of the Motion.  The referenced portions of the Booher deposition, including the appended photos, provide some help and may even be sufficient to determine the character of some items and the facts surrounding their installation (Booher, for example, testified that some items were installed at the insistence of LDS's principal customer); the Motion, however, seeks relief as to the Equipment generally, and the court does not intend to go through a non-exclusive list of items to afford LDS piecemeal relief on the Motion.

[17]     The Booher deposition also supports to some extent the inference that LDS was replacing or repairing what was originally on the Property (e.g., "What was there…it had just deteriorated and [our customer] would not accept it any longer…."  Booher deposition, p. 23).

1.      Lease Ineffective

Obviously, if the Trustee has no title to the Lease, he cannot reject it, though precisely how this helps LDS eludes the court. On this assumption, the Trustee's inability to reject the Lease is derived from the lack of any right in LDS to possession of the Property associated with the Lease.  Nevertheless, the court will grant the Motion; Plaintiff shall have summary judgment that, if the Trustee has no right to enforce the Lease, is not a party to it, he cannot reject it.

2.      Lease Effective

If the Lease is in effect, certainly the Trustee, upon a proper showing may reject it. *See* Code § 365(a); *Official Comm. of Unsecured Creditors of Mirant Corp. v. Potomac Electric Power Co. (In re Mirant Corp.)*, 378 F.3d 511, 517 (5th Cir. 2004) (clearly stating that a contract or lease may be rejected unless it is specifically excepted from the operation of section 365); *see also* 3 COLLIER ON BANKRUPTCY ¶ 365.01 (15th ed. rev. 2006); *NLRB v. Bildisco & Bildisco*, 465 U.S. 513 (1984); *Stewart Title Guar. Co. v. Old Republic Nat'l Title Ins. Co.*, 83 F.3d 735, 741 (5th Cir. 1996); *Orion Pictures Corp. v. Showtime Networks (In re Orion Pictures Corp.)*, 4 F.3d 1095, 1098 (2d Cir. 1993); *L.R.S.C. Co. v. Rickel Home Ctrs., Inc. (In re Rickel Home Ctrs., Inc.)*, 209 F.3d 291, 298 (3d Cir. 2000); *Weingarten Nostat, Inc. v. Serv. Merch. Co.*, 396 F.3d 737, 742 (6th Cir. 2005); *Harrison v. Emerald Outdoor Adver., LLC (In re Emerald Outdoor Adver., LLC)*, 444 F.3d 1077, 1080 n.4 (9th Cir. 2006).  LDS has cited no exception to section 365 for leases of real property where the trustee is the landlord.  Indeed, section 365(h), which provides special rules for dealing with rejection of such a lease, does not limit the trustee's

ability to reject but rather sets forth the consequences of rejection.

LDS argues that the Trustee should not reject the Lease.  However, the evidence before the court is insufficient to conclude that a reasonable jury could not find that rejection is warranted.  Therefore, because the Trustee *can* reject the Lease — whether or not he *should* — summary judgment on this issue must be denied.

G.    Stay Motion

This brings the court to LDS's request that the Stay Motion be granted.  Having failed to show that LDS's debt exceeds $200,000 or that the value of the Property is less than $200,000, LDS has not shown an absence of equity in the Property (Code § 362(d)(2)).  As LDS has possession of the Property, and the value of the possessory right is approximately $30,000 per year (at rent of $2,500 per month), it is adequately protected even if, as it contends, the value of the Property is going down.  No cause for relief from stay has therefore been advanced (Code § 362(d)(1)).  Thus the Court will deny the Motion to the extent it seeks relief on the Stay Motion.

## V. Conclusion

For the reasons stated, the Motion is granted in part and denied in part.  Counsel for the Trustee is directed to prepare and submit to the court an order and judgment consistent with the foregoing.

#### END OF MEMORANDUM OPINION ####